## HENRIETTE CATHARINE GUÉRIN *v.* ACHILLE RIVARDE.

After a wife has obtained a separation of property, or a separation from bed and board carrying with it a separation of property, she may alienate any property formerly dotal, and, consequently may ratify any alienation made before the separation. Code of 1808, book 3, tit. 5, arts. 36, 41, 42, 97 ; tit. 20, art. 59. C. C. 2337, 2342, 2343, 2355, 2410, 2411, 2421, 3490.

Where dotal property has been alienated by a wife who afterwards obtains a separation of property, prescription will run in favor of the purchaser from the date of the separation.

APPEAL from the District Court of the First District, *Buchanan*, J.

*D. Seghers,* for the appellant. The marriage of the plaintiff having taken place in 1813 it is by the laws then in force that the present controversy must be governed. By the statute of June 7, 1806, it is provided, sect. 10, that " slaves shall always be reputed and considered real estate ; shall be, as such, subject to be mortgaged, according to the rules prescribed by law ; and they shall be seized and sold as real estate." Bullard & Curry's Digest, page 49.

Our Civil Code of 1808, contains the following provisions ; page 328, *et seq.* article 34. The estimated value of immoveables or of slaves settled as a dowry, " does not transfer the property of the same to the husband, unless there be an express declaration to that effect."

Art. 36. " Immoveables settled as a dowry, can be sold or mortgaged during the marriage, neither by the husband, nor by the wife, nor by both together, except &c."

Art. 39. " Immoveables settled as a dowry, may be sold when the sale of the same has been allowed by the marriage contract."

Art. 41. " If, except as above excepted, the wife or husband, or both jointly, sell the dotal estate, the wife or her heirs may cause said sale to be set aside after the dissolution of the marriage, &c." " The wife shall have the same right after a separation of property." " The husband himself may cause that sale to be annulled during the marriage, but in that case he remains however bound for the damages and losses of the purchaser, if he has not declared in the deed of sale that the estate thus sold was a dowry estate."

With exception of this last paragraph as to the husband, the provisions of the present Civil Code, are the same. Vide articles 2335, 2337, 2340, 2342.

Reverting to the questions of law in this cause, it is contended,

that there was no sale; that the deed of sale executed by the plaintiff and her husband to the defendant, on the 1st of June, 1833, was a nullity *ab initio*, having being made in open violation of the law. *Quod, lege prohibente fit, ipso jure nullum est.* The inhibition of the law is absolute; the exceptions are specified; the case comes within neither of them; and as to the other motives alleged by the defence, they cannot be listened to. *Ubi lex non distinguit, nec nos distinguere debemus.* The plaintiff's right to bring this action is established by art. 41, page 330 of the Code of 1808.

But it is contended that, after the judgment of separation from bed and board (*de corps et de biens*,) she has, in the settlement of her rights with her husband, received the value of the slaves constituted in dowry, to wit; $2300, being the value at which they were appraised in the marriage contract, and that the receiving of the price of the slaves, after the separation, was a ratification of the sale.

To this we answer:

1. That the notaries who made the settlement and partition between the plaintiff and her husband must be presumed to have been ignorant of the laws of Louisiana, or they would not have allowed the plaintiff in the settlement, the price of property which had not ceased, and could not have ceased to be her own.

As however, she had profited by this blunder in the sum of two thousand three hundred dollars, she tendered to the defendant the amount he had actually disbursed for the price of the slaves, to wit, the sum of $2250; Record 5486, page 4, and Record 3131 page 96. The sale was made for $2550, which was received by the plaintiff's husband as stated in the act; of this sum the defendant was repaid $300, by the sale of the boy Clement, whereby the amount actually disbursed by the defendant was reduced to the sum of $2250, which the plaintiff tendered by her petition, with legal interest thereon.

2. That the plaintiff's incapacity to alienate her dowry did not cease by the effect of the separation from bed and board. The law is as explicit and as absolute as to the duration of the incapacity, as to the inhibition itself. The inhibition is to last during the marriage. Now the marriage is not dissolved by a separation from bed and board, for neither of the spouses could contract another marriage during the lifetime of the other.

Ratifying the sale, would in fact be alienating, which the plaintiff was and is still as incapable of doing as she was on the day of the sale to the defendant.

A second question presented by this case is, whether the defendant owes fruits from the date of the judgment of separation

from bed and board, or from the date of the judicial demand? The doctrine on this subject is elaborately explained by this court in *Dufour* v. *Camfrancq*, 11 Martin, 713.

According to the rules there laid down, it is contended that, in the present case, the defendant cannot plead ignorance of the want of right or authority in his vendor to sell, for the deed of sale contains, in clear and explicit language, the express mention that the slaves were settled as a dowry on the vendor by her marriage contract, the date of which, together with the name of the notary, are expressly recited. Nay, the deed of sale itself shows, that he was well aware of the danger he was incurring, for it stipulates a warranty on the part of the husband to indemnify him in case of eviction.

It is therefore contended, that he owes the fruits, that is to say, the hire of the slaves, from the date of the judgment of separation.

The plea of *res judicata* cannot be sustained. There was no plaintiff capable *standi in judicio*. 2 La. 147. To support such a plea there must have been three parties—*judex, actor, reus*.

*Canon*, for the defendant.

*Denis*, for the warrantor. Dotal property ceases to be such after a separation of property. Code Nap. arts. 1540, 1549. Code of 1808, p. 327, arts. 16, 29. Code of 1825, arts. 2317, 2330. After such a separation the wife may alienate property formerly dotal, or ratify an alienation of dotal property made before the separation of property. Civil Code, art. 2343. 14 Toullier, pp. 258, 259, No. 233. Ibid. p. 274 to 281, No. 253.

SIMON, J. The plaintiff, wife of J. B. Guérin, but separated from bed and board from him, has instituted this action, with the authorization of the judge, *a quo*, to recover six slaves which are in the possession of the defendant, and which she claims as part of her dotal property, illegally alienated and sold by herself and husband to the said defendant previous to the separation.

She alleges, that her marriage with Guérin was celebrated on or after the 25th of October, 1813, on which day a marriage contract was passed and executed between the parties, by which, among other property brought into marriage by the wife, and settled as a dowry or marriage portion, there were five slaves which are named in the petition; that, in June, 1833, the spouses left this country for France, and on their arrival settled in the city of Nantes, where, for divers pre-existing causes by her stated in the petition, she was obliged to sue her husband for a separation from

bed and board; when, on the 6th of November, 1834, a final judgment was rendered, separating her from bed and board, from her said husband, and authorizing her to prosecute the partition of the community, as well as the settlement of her dotal and pharaphernal rights.

She further states, that on the eve of starting for France, her husband prevailed upon her, through fear, to sign an act, before a notary public, dated the 1st of June, 1833, purporting to be a deed of sale to the defendant of seven slaves belonging to her, and making a part of her dowry or marriage portion settled by the said marriage contract, for the price of $2550, paid to the vendors. That afterwards, on the 10th of June, 1833, one of the slaves was sold by the defendant to one François Sel for $300, paid in cash to the defendant; that said slave has since died, but that the six other slaves are still in the possession of the defendant. She further avers, that the pretended sale of the first of June is void *ab initio*, and could produce no effect; that, in fact, there was no sale, and that she never was divested of her ownership of the slaves.

She further alleges a tender to the defendant of the sum of $2250, by him actually disbursed in the purchase of the slaves; a refusal on his part to restore them to her possession, and to pay her the hire they may have produced since the date of the judgment of separation; and she prays for judgment against him accordingly.

The answer, after pleading the general issue, avers that the plaintiff and her husband, being about leaving permanently for France, when the cholera was raging in New Orleans, applied to him, and prevailed upon him to purchase the slaves in controversy; that he, defendant, was then advised that said slaves were dotal property; but that the vendors observed to him, that it would be a dead loss to them not to sell the slaves, &c.; and that after many days hesitation, the purchase was made for the sum of $2550.

The defendant further alleges, that soon after the arrival of the spouses in France, they were separated in bed and board, and that the plaintiff returned to this country, after having fully settled her money concerns with her husband, by a notarial act passed on

the 19th of December, 1834, *in which she acknowledges to have received the price of said slaves.* He further pleads the exception of *res judicata* against the plaintiff's demand, as resulting from a judgment rendered by the District Court against the plaintiff on the same cause of action, which judgment was appealed from to this court, and the appeal thereof dismissed, in April, 1839. He sets up a reconventional demand for damages against the plaintiff, in consequence of the fraud by her intended and practiced in making the transaction with him, and of the two vexatious suits brought against him, which have been the cause of large expenses and considerable trouble, to the amount of $2000. Wherefore he prays for a judgment in his favor for the property, and for the damages.

During the progress of this suit, the defendant filed an amended answer for the purpose of calling J. B. Guérin, the plaintiff's husband, in warranty. A curator, *ad hoc*, was accordingly appointed to represent said Guérin as an absentee, in whose name issue was joined by the curator, *ad hoc*, who adopted every means of defence set forth by the defendant in his answer, further pleading the settlement made between the said Guérin and the plaintiff, by act of the 6th of November, 1834, before a notary public, as a bar to this action, &c.

After a full investigation of the plea of *res judicata*, and of the merits of this action, with regard to which evidence was introduced and admitted on both sides, the judge, *a quo*, conceiving h at the exception, *rei judicatœ*, was well founded, gave judgment n favor of the defendant ; from which, after a vain attempt to obtain a new trial, the plaintiff has appealed.

The present action is a renewal of the plaintiff's pretensions as by her set up in the case reported in 13 La. 218, the judgment in which is now opposed as a bar to this action, under the plea of *res judicata ;* but as, from the view we have taken of the principal question on the merits, it has become unnecessary to examine the exception on which the case was decided below, and as the record contains the whole of the evidence which the parties had to produce in support of their respective rights, we are enabled and think proper to make a final disposition of the cause, on the real merits which it presents.

The principal facts established by the evidence, are as follows. The marriage between the plaintiff and Jean B. Guérin, took place in New Orleans, on or about the 25th of October, 1813. By their marriage contract, executed on that day before a notary public, the plaintiff brought into marriage and settled as her dowry, (*apporte en mariage et se constitue en dot,*) among other property, five slaves, to wit: Gertrude, estimated at the sum of $800, and Lucie and her three children, Marie, Hedy and Obadiah, estimated together at $1500. The parties continued to live here until the year 1833, when, a short time before their departure for France, the plaintiff, with the authorization of her husband, sold the slaves Marie with her two children, Hedy and her two children, and Obadiah, to the defendant, for the sum of $2550 cash. The property sold was declared in the sale to be dotal property, according to the marriage contract therein referred to. The spouses went to France and settled at Nantes; where, on the 6th of November, 1834, they were separated from bed and board, by a judgment regularly rendered, authorizing the plaintiff "*à poursuivre le partage de la communauté qui a existé entre elle et son mari, et la liquidation de ses droits et reprises.*" This judgment was executed by the parties repairing before two notaries, and agreeing upon and executing a settlement of the community and of their respective rights and separate property. This act was passed on the 19th of December, 1834, the parties being assisted by their counsel, and recites, among other statements relative to the intended settlement, "*que Madame Guérin a apporté en mariage une somme totale de cinq mille trois cent quatre-vingt dix piastres, valeur en esclaves, bestiaux et crédits.*" This sum corresponds exactly with the amount stated in the marriage contract to be the estimated value of the wife's property. The parties proceeded in the said act to establish the amount of the active means of the community, ascertained to be a sum of 199,098 98–100ths francs; from which, after deducting the amount of the debts due by the community, *and the amount of the respective rights of the spouses*, there remained a balance in favor of the community of 83,601 76–100ths francs, to be equally divided between them. After this operation, the rights of the plaintiff are first taken in consideration in the

said act, and liquidated at the sum of 74,695 05–100ths francs, said to be "*le total des droits de Mdme. Guérin.*" A similar liquidation is made as to the rights of the husband; after all which, the act is closed with the following declaration, made by the parties before signing, to wit: "*De tout ce qui précéde M. Lallie et son collegue ont dressé le present procés-verbal, duquel il résulte que la communauté d'entre Mr. et Mdme. Guérin est liquidée, et ces derniers déclarent approuver la présente liquidation, reconnoisant que les calculs en sont justes et éxactes, et qu'ils n'ont plus rien à répeter l'un contre l'autre.*" Thus, the plaintiff's dotal rights were liquidated, and satisfied out of the funds forming the active mass of the community, one-half of the nett proceeds of which was also paid over to her, in addition to the amount stated in the marriage contract.

This act of settlement and liquidation was undoubtedly passed in conformity with art. 1444 of the Napoléon Code, from which we have borrowed art. 88, p. 342, of the Code of 1808, and art. 2402 of the present Civil Code, which all require a separation of property to be executed by the payment of the rights and claims of the wife, made to appear by an authentic act, as far as the estate of the husband can meet them; and as the judgment of separation had put an end to the community, it had also become necessary to settle it, and to divide its proceeds between the parties.

From the issues made up in this case, and from the evidence which comes up with the record, the real merits of the controversy may be reduced to one single question; whether the wife can, after a separation of property, or of bed and board, which carries with it a separation of property, ratify the sale previously made of part of her dotal estate?

The marriage of the plaintiff with Guérin having taken place in 1813, it is by the laws then in force, that the present controversy is to be governed.

It cannot be controverted, that at the time the sale to the defendant was executed, immoveables settled as a dowry could not be sold or in any manner alienated, either by the husband or by both together, except in certain cases. This is the purport of art. 36, p. 328, of the Code of 1808, which has been re-enacted in the Civil Code, art. 2337, and is taken from art. 1554 of the

French Code; and they all say that such alienation shall not be permitted, *during the marriage.* Under art. 41, p. 330, of teh Code of 180 8, corresponding with art. 2342 of the Civil Code, and 1560 of the Napoléon Code, if, except as before expressed, the wife or husband, or both jointly, alienate the dotal estate, the wife or her heirs may cause the alienation to be set aside *after the dissolution of the marriage,* and no prescription shall run *during the marriage* in bar of this right, *and the wife shall have the same right after the separation of property.* The last paragraph of this article appears to modify the preceding expression " *during the marriage,"* so as to give to the wife the right of causing the alienation to be set aside after the separation of property, whilst by the preceding one, she could not do so but after the dissolution of the marriage. Thus, the article seems to assimilate the effect of the separation of property to that of the dissolution of the marriage. We find also, with regard to the prescription which the same article says shall not run during the marriage in bar of the right, it is provided, by art. 42, p. 330, of the Code of 1808, which is the same as art. 2343 of the present Civil Code, and art. 1561 of the French Code, that, " immoveables which are a part of the dowry, are imprescriptible *during the marriage; they become prescriptible after the separation of goods, whatever be the time at which the prescription began."* This law, which is a repetition of art. 3490 of the Civil Code, and goes further than art. 59, p. 486, of the Code of 1808, shows conclusively that, under the law governing at the time of the plaintiff's marriage, immoveables and slaves given in dower, though imprescriptible during the marriage, may be prescribed for, if there be a subsequent separation of property between the spouses, and that, therefore, a third person who has a just title to dotal property, sufficient to acquire it by prescription, may avail himself against the wife, after the separation, of the prescription necessary to cure the defects of the illegal alienation made *during the marriage,* whatever be the time at which the prescription began, and thereby acquire a good title to the dotal property though illegally alienated in its origin. This is one of the legal effects of the separation of property, which, as Toullier says, vol. 14, No. 253, " *dissout le lien de la constitution dotale, de même*

*qu'elle dissout le lien de la communauté."* This author considers the words used in the law prohibiting the alienation of dotal property, *during the marriage (pendant le mariage,)* not to mean, *as long as the marriage shall subsist,* for then, they would be inconsistent or in conflict with the other articles, but as applicable to the marriage considered in relation to the property of the spouses, and to cases where such marriage so considered, or rather the legal obligations resulting therefrom, have not been impaired by the separation.

In support of this doctrine, our old Civil Code, art. 97, p. 342, which corresponds with art. 2410 of the present Code, and with art. 1449 of the Napoléon Code, informs us, that " the wife separated in property resumes the free administration of her estate, and that she cannot alienate her immoveable (dotal) property, without the consent of her husband or of the judge." And art. 2411 of the Civil Code, goes so far as to provide, that " the wife, whether separated in property or not, cannot, except by and with the consent of the husband, or of the judge, *alienate her immoveable effects, of whatever nature they may be,* except in cases where the alienation of the dotal immoveable is permitted." Is it not clear, from these laws, that the alienation of dotal property is permitted after the separation of property, provided it be made with the authorization of the husband? The dotal property ceases, by the separation, to be under the control of the husband. It is transferred to the administration of the wife, who becomes thereby enabled to do with it what she pleases, and to dispose of it in the manner she thinks proper. Toullier, *loco citato,* says : *"Donc, la séparation anéantit les effets de la dotalité à l'égard de l'inaliénabilité des fonds constitues en dot, aussi-bien qu'à l'égard de leur imprescriptibilité ;"* and he thinks that according to the principles of the Code, " *la femme séparée, sous quelque régime. qu'elle ait été mariée, recouvre, par la séparation, le droit de vendre ses immeubles avec l'autorisation de son mari ou de la justice."* See also Delvincourt, vol. 3, p. 114, notes. Sirey, vol. 13, part 2, p. 209, and a decision of the court of Montpellier, reported by Dalloz, *verbo,* Mariage, ch. 2, § 3, art. 3.

We are aware that a contrary opinion is entertained by many other French commentators of celebrity, such as Duranton, Dal-

loz, Favard, &c.; and that the Court of Cassation has uniformly maintained by its decisions, the doctrine, that dotal property cannot be alienated, even after the separation; but the articles of our Code above quoted, as having been borrowed from the French Code, are not the only ones containing provisions relative to the alienation of dotal property. We have several articles which are not embodied in the Napoléon Code, and which belong to our special legislation; for instance, art. 2421, of the Civil Code, permits a sale from the husband to the wife, when the transfer made to her, even though not separated, has a legitimate cause, as the replacing *of her dotal,* or *other effects alienated.* Articles 2355 and 3287 give a legal mortgage to the wife for the replacing of her dotal effects *alienated* by the husband. Be this as it may, we cannot consent to put on the articles of our Code, the same construction as appears to have been adopted by the civilians whose opinions are contrary to Toullier's. The reasoning of the latter is clear and conclusive. His doctrine destroys the inconsistency that would exist between arts. 2337, 2342, 2343, 2410 and 3490 of our Code; it explains satisfactorily the meaning of the words " *during the marriage,*" relied on by the plaintiff's counsel; and is, in our opinion, more concordant with the spirit of our laws and of our institutions. There would be a flagrant contradiction between the law that says, that dotal property cannot be alienated *during the marriage,* and that which provides that dotal property *can be prescribed for after the separation of property ;* and it is manifest, that art. 2410, which puts such property under the control and administration of the wife after the separation, and permits her to alienate it with the authorization of her husband or of a court of justice, would thus become a dead letter.

It results from the view we have taken of the question of alienation, that the plaintiff. became capable, and was at liberty, after the separation, to alienate her property formerly dotal; and that she could dispose of it as she pleased; and it is clear that, if she could do this, she was also fully capable of ratifying any previous alienation of her property. It is true she might have sued for the nullity of the sale made to the defendant, immediately after the judgment of separation was rendered. But she did not choose

to do so. She preferred receiving from her husband the amount of her rights and claims under the marriage contract. She got the value of her dotal property as fixed by said contract, whether existing or not ; and no one can deny that this must amount to a tacit and sufficient ratification. Toullier, vol. 14, No. 233, says : *" L'action en nullité peut être éteinte avant le tems de la préscription, si l'acte d'aliénation fait en contravention au principe de l'inaliénabilité du fond dotal, a été approuvé ou ratifié par la femme, depuis la dissolution du mariage ou la séparation de biens."* It is also clear, that if the plaintiff had not ratified the sale, and had permitted a sufficient length of time to elapse, before setting up her claim judicially to the property by her alienated, the defendant would have been able to acquire it by prescription after the judgment of separation ; and it is obvious that, if his title could be perfected in this manner, notwithstanding the original *dotalité* of the property sold, it may be equally perfected by a subsequent ratification.

We therefore conclude, that the plaintiff has no right to recover the slaves in dispute, and that the judgment of the court, *a qua*, rendered against her on the plea of *res judicata*, should have been so rendered on the merits.

*Judgment affirmed.*